**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

------------------------------------------------------------

REGINALD FORDHAM,

                           PLAINTIFF,

VS.

EQUIFAX INFORMATION SERVICES, LLC,

                     DEFENDANT.

------------------------------------------------------------

CASE NO.:

**<u>JURY TRIAL DEMANDED</u>**

<u>**COMPLAINT**</u>

       Reginald Fordham ("Plaintiff" or "Mr. Fordham"), a living, breathing, 58-year-old consumer, brings this Complaint against Equifax Information Services, LLC ("Defendant" or "Equifax") and states as follows:

<u>**INTRODUCTION**</u>

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring service to a consumer.

3.  The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.  These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.  Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.  One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

    The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.  The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.* * * * *[A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.  The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10. Plaintiff's claims arise out of Equifax's blatantly inaccurate credit reporting, wherein Equifax reported to Plaintiff's potential creditors that he was "deceased" and did not have a credit score.

11. Accordingly, Plaintiff brings a claim against Equifax for failing to reasonably ensure the maximum possible accuracy of Plaintiff's credit report in violation of the FCRA, 15 U.S.C. § 1681e(b).

12. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

13. Plaintiff Reginald Fordham ("Plaintiff" or "Mr. Fordham") is a natural person who resides in the State of Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company that resides in the State of Georgia.

15. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information

concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

18. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

19. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

20. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

21. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

22. Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

23. Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

24. Defendant does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

25. Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

26. In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax credit file, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or

administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

27. Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

28. Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

29. Defendant does not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

30. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

31. Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

32. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

33. Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

34. Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

35. Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

36. Defendant knows that living consumers are routinely turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

37. Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

38. Defendant has received and documented many disputes from consumers complaining that their Equifax credit report had them erroneously marked as "deceased."

39. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

40. Nevertheless, Defendant does not employ any procedures to assure that a consumer marked as "deceased" on their Equifax credit report is, in fact, deceased.

41. Even consumers who dispute the erroneous "deceased" status on their Equifax credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

42. Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

43. Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

44. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

45. Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

46. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

47. Defendant profits from the sale of reports on deceased consumers.

48. Defendant has in its respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

49. Defendant knows that truly deceased consumers do not apply for credit.

50. Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

51. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

52. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

53. Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

54. Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

55. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

56. Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Fordham Attempts to Obtain Credit for a Home Loan from Guaranteed Rate in September 2019**

57. In or about Sep 16, 2019, Fordham began looking for different options for a credit card.

58. On Sep 16, 2019, Fordham submitted an online credit application with Guaranteed Rate in in hopes of being approved for a credit card.

59. Fordham was prompted to provide his personal identification information, complete a credit application, and provide Guaranteed Rate with authorization to obtain his credit report(s).

60. Fordham was seeking a home loan.

**Guaranteed Rate Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting**

61. On or about Sep 16, 2019, Fordham received an Adverse Action Notice from Guaranteed Rate, informing him that his credit application had been denied.

62. Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands

that his credit record with his creditors is good, so Fordham could not imagine how his credit application had been denied by Guaranteed Rate.

63. While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof Guaranteed Rate needed to override this mistake so he could proceed with the loan he desired. However, Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Guaranteed Rate informed him that it could not move forward with financing given Equifax's information.

**Fordham Disputes Equifax's Inaccurate Credit Reporting in September 2019**

64. In or about September 2019, Fordham placed a telephone call to Equifax to dispute the "deceased" status appearing on his Equifax credit file.

65. After being on the phone with various Equifax representatives in an attempt to have his credit report corrected, Fordham was informed that Equifax received the information regarding his apparent death from Synchrony Bank and instructed him to mail documentation to Equifax establishing proof of life instead of correcting it after the phone dispute.

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

66. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

67. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

68. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

69. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

70. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

71. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

72. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

73. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

74. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

75. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Equifax's Response to Plaintiff's January 28, 2021 Dispute**

76. On March 6, 2021, Equifax completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. Equifax failed to properly reinvestigate and delete the deceased notation on disputed credit account, which continued to appear on Plaintiff's Equifax credit report.

**Fordham Attempts to Obtain Credit for a credit card from Discover Bank in December 2019**

77. In or about Dec 30, 2019, Fordham began looking for different options for a credit card.

78. On Dec 30, 2019, Fordham submitted an online credit application with Discover Bank in hopes of being approved for a credit card.

79. Fordham was prompted to provide his personal identification information, complete a credit application, and provide Discover Bank with authorization to obtain his credit report(s).

**Discover Bank Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting**

80. On or about Dec 30, 2019, Fordham received an Adverse Action Notice from Discover Bank, informing him that his credit application had been denied.

81. Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Fordham could not imagine how his credit application had been denied by Discover Bank.

82. While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof Discover Bank needed to override this mistake so he could proceed with the loan he desired. However, Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Discover Bank informed him that it could not move forward with financing given Equifax's information.

**Fordham Attempts to Obtain Credit for an Auto Loan from Citizens One Auto Finance in May 2020**

83. In or about May 27, 2020, Fordham began looking for different options for an auto loan.

84. On May 27, 2020, Fordham submitted an online credit application with Citizens One Auto Finance in hopes of being approved for an auto loan.

85. Fordham was prompted to provide his personal identification information, complete a credit application, and provide Citizens One Auto Finance with authorization to obtain his credit report(s).

**Citizens One Auto Finance Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting**

86. On or about May 27, 2019, Fordham received an Adverse Action Notice from Citizens One Auto Finance, informing him that his credit application had been denied.

87.  Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Fordham could not imagine how his credit application had been denied by Citizens One Auto Finance.

88. While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof Citizens One Auto Finance needed to override this mistake so he could proceed with the loan he desired. However,

Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Citizens One Auto Finance informed him that it could not move forward with financing given Equifax's information.

**Fordham Attempts to Obtain Credit for an Auto Loan from Capital One in May 2020**

89. In or about May 27, 2020, Fordham began looking for different options for a car loan.

90. On May 27, 2020, Fordham submitted an online credit application with Capital One in hopes of being approved for a car loan.

91. Fordham was prompted to provide his personal identification information, complete a credit application, and provide Capital One with authorization to obtain his credit report(s).

**Capital One Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting**

92. On or after May 27, 2020, Fordham received an Adverse Action Notice from Capital One, informing him that his credit application had been denied.

93. Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Fordham could not imagine how his credit application had been denied by Capital One.

94. While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof with Capital One needed to

override this mistake so he could proceed with the loan he desired. However, Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Capital One informed him that it could not move forward with financing given Equifax's information.

### Fordham Attempts to Obtain Credit for a Home Loan from Wintrust Mortgage in January 2020

95. In or about January 27, 2020, Fordham began looking for different options for a home loan.

96. On January 27, 2020, Fordham submitted an online credit application with Wintrust Mortgage in New York, in hopes of being approved for a home loan.

97. Fordham was prompted to provide his personal identification information, complete a credit application, and provide Wintrust Mortgage with authorization to obtain his credit report(s).

98. Fordham was seeking a home loan so he could move to Florida.

### Wintrust Mortgage Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting

99. On or about October 14, 2020, Fordham received an Adverse Action Notice from Wintrust Mortgage, informing him that his credit application had been denied

100.    Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Fordham could not imagine how his credit application had been denied by Wintrust Mortgage.

101.     While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof Factual Data/Wintrust Mortgage needed to override this mistake so he could get the home loan. However, Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as Wintrust Mortgage informed him that it could not move forward with financing given Equifax's information.

### Fordham Attempts to Obtain Credit for a Mortgage Loan with AmeriFirst Financial in October 2020

102.     In or about October 19, 2020, Fordham began looking for different options for a home loan.

103.     On October 19, 2020, Fordham submitted an online credit application in hopes of being approved for a home loan.

104.     Fordham was prompted to provide his personal identification information, complete a credit application, and provide AmeriFirst Financial with authorization to obtain his credit report(s).

105.     Fordham was seeking a home loan so he could move to Florida.

### AmeriFirst Financial Denies Fordham Credit Due to Defendant's Inaccurate Credit Reporting

106.     On or about October 19, 2020, Fordham received an Adverse Action Notice from AmeriFirst Financial, informing him that his credit application had been denied.

107.     Fordham takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Fordham could not imagine how his home loan application had been denied using AmeriFirst Financial.

108.     While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Fordham genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof AmeriFirst Financial needed to override this mistake he could proceed with obtaining financing he desired. However, Fordham quickly discovered that correcting this obvious error would not be as easy as he had hoped, as AmeriFirst Financial informed him that it could not move forward with financing given Equifax's information.

**Fordham Disputes Equifax's Inaccurate Credit Reporting in October 2020**

109.     In or about October 2020, Fordham placed a telephone call to Equifax to dispute the "deceased" status appearing on his Equifax credit file.

110.     Plaintiff wasted time on the phone with Equifax, yet Equifax did not correct the errors.

**Plaintiff's Dispute with Equifax in December 2020**

111.     On or about December 7th, 2020, feeling even more shocked, surprised, and embarrassed as a result of Defendant's inaccurate reporting, Plaintiff mailed written disputes to Equifax via certified mail, disputing the deceased notations Equifax was reporting in his credit reports. Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him corrected copies of his credit report.

112.     Plaintiff's December 2020 dispute specifically included his full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify him and locate his credit file.

113.     Plaintiff also attached the following documents to his December 2020 disputes to serve as further proof that he is alive: a photocopy of his current driver's license and social security card.

114.     As a result of the "deceased" annotation, Defendant made it practically impossible for Fordham to obtain credit.

115.     Furthermore, as a direct result of Defendant's reporting of the inaccurate "deceased" notation on Fordham's credit file, multiple creditors closed Fordham's active credit accounts because they assumed he was deceased, causing Fordham further financial harm and negatively impacting his credit scores.

116.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

117.     At all times pertinent hereto, the conduct of Defendant, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Mr. Enochs herein.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

98. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-97 as if fully stated herein.

99. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

100. On numerous occasions, Defendant prepared a patently false consumer report concerning Plaintiff.

101. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

102. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

103. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; out-of-pocket loss; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

104. Defendant's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

105. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation

106. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-97 as if fully stated herein.

107. The FCRA mandates that Defendant Equifax conducts an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act impose a 30-day time limitation for the completion of such an investigation. Id.

108. The FCRA provides that if Defendant Equifax conduct an investigation of disputed information and confirm that the information is in fact inaccurate, or are unable to verify

the accuracy of the disputed information, they are required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

109. On multiple occasions during 2020 and 2021, Plaintiff sent written disputes to Defendant Equifax, pleading with them to comply with their statutory reinvestigation obligations and correct and/or delete specific items in his credit files that are patently inaccurate, misleading, and highly damaging to him and his ability to obtain credit, namely, references to him being "deceased."

110. Either Defendant Equifax conducted no investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit files, namely, the deceased notations.

111. Defendant Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

112. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

113. Defendant Equifax's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

114. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. Determining that Defendant negligently and/or willfully violated the FCRA;

b. Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

115.     Plaintiff demands a trial by jury.


Dated: June 7, 2021                    **JOSEPH P. MCCLELLAND, LLC**

                                       _/s/_Joseph P. McClelland
                                       545 N. McDonough Street, Suite 210
                                       Decatur, GA 30030

Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com

*ATTORNEY FOR PLAINTIFF*